

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Savage Services Corp., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action H-22-3405 |
| | § | |
| Cajun Industries, LLC, | § | |
| *Defendant*. | § | |
| | § | |

**MEMORANDUM AND RECOMMENDATION**

In this construction contract dispute, Savage Services Corporation (Savage) sued Cajun Industries, LLC (Cajun) seeking a declaratory judgment that it owes Cajun no further compensation under the parties' contract. Savage also brought claims for breach of contract. Cajun brought counterclaims for breach of contract. This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). ECF No. 58. Pending before the court is Savage's Motion for Partial Summary Judgment, ECF No. 27, Cajun's Motion for Partial Summary Judgment on Cajun's Counterclaims and Savage's Claims, ECF No. 55, and Savage's Motion for Partial Summary Judgment on Savage Service Corporation's Claim for Attorneys' Fees, ECF No. 56. Also pending are various objections to and motions to strike the summary judgment evidence. ECF Nos. 42, 53.

The court recommends that Savage's motion for partial summary judgment, ECF No. 27, be **GRANTED**, that Cajun's motion for partial summary judgment, ECF No. 55, be **GRANTED in part and DENIED in part**, and that Savage's motion for partial summary judgment on Cajun's request for attorney's fees, ECF No. 56, be **GRANTED.** The court thus recommends that Savage's request for a declaration that it owes no further

1

compensation to Cajun be **GRANTED**, and that both parties' claims for breach of contract be **DISMISSED with PREJUDICE**. All claims for attorney's fees should be **DISMISSED with PREJUDICE**.

The objections and motions to strike the summary judgment evidence are **DENIED as MOOT**.

### 1. Background and Procedural Posture

Savage is a national freight and transportation company that operates rail, trucking, and shipping facilities throughout the Gulf Coast. ECF No. 27 at 4. In 2019, Savage hired Cajun to construct a rail terminal facility in Gregory, Texas. *Id.* In early October 2019, the parties started work on the terminal under a Memorandum of Understanding ("MOU"). ECF No. 27-2. On November 4, 2019, the parties executed a Master Work Agreement ("MWA") that superseded the MOU. ECF No. 27-3. On February 13, 2020, the parties executed a First Amendment to the MWA. ECF No. 27-1 (Amended MWA or AMWA). Together, the MWA and the Amended MWA governed the relationship between the parties on the construction project.[1]

The parties agreed that Cajun would be paid for the actual labor hours and materials it expended on the project plus a markup. ECF No. 43-2 at 22 (AMWA Sch. H-3). There is no dispute that Cajun was paid in full for its time and materials. Munoz Depo., ECF No. 27-6 at 72; *see also* ECF No. 27 at 1; ECF No. 43 at 2.

In addition to compensation for its time and materials, Cajun was also entitled to 40% of any amount that the project came

---

[1] The seventy-eight-page Amended MWA contains seventeen paragraphs, which modify, delete, or add new "sections" and/or "articles" to the MWA. Thus, the MWA and the Amended MWA must be read together. "Section" and "Article" are used somewhat interchangeably in the Amended MWA. For ease of reference, and because the MWA used the word "section" to refer to its subparts, the court uses "section" or "§" herein. After the seventeen paragraphs are "Schedules" A through L. Following those schedules is a lengthy document called the "Definitive Estimate – Basis of Estimate," which discusses in detail the scope of work that Cajun was expected to perform. ECF No. 43-2 at 40–60.

in under budget. ECF No. 43-2 at 23 (AMWA Sch. H-4). The Amended MWA defined a "Base NTE[2] Amount" to be $37.4 million. *Id.* at 21 (Sch. H-1). If Cajun completed work on the project for less than the Base NTE Amount, Savage was obligated to pay Cajun 40% of the "Cost Savings Amount," which was defined as the difference between the then-projected project cost and the Base NTE. *Id.* at 23 (AMWA Sch. H-4). Savage agreed to pay Cajun its share of the Cost Savings Amount "within thirty (30) days after receipt of an invoice for such amount from Contractor (which, for the avoidance of doubt, cannot be delivered prior to Contractor's receipt of the final invoice . . .)." *Id.* The parties agreed to submit disputes about the Cost Savings Amount to the courts of Harris County, Texas. *Id.* (AMWA § 8.7); MWA § 18. The main dispute in this case is whether Cajun was paid in full for its portion of the Cost Savings Amount.

The Amended MWA implemented a "Change Order" process for Cajun to be paid for work outside the scope of work contemplated when the Amended MWA was executed. ECF No. 43-2 at 4–7 (AMWA § 8). If Savage wanted to change the description of the work to be performed, the time for performance, or the compensation Cajun was to be paid, it was required to issue a written "Change Order" to Cajun, which Cajun could accept in writing or just by starting the requested work. *Id.* at 4 (AMWA § 8.1). Cajun agreed that its compensation could not be changed by "implication, oral agreements, actions, inactions, course of conduct, or constructive change order." *Id.*

Cajun also had the ability to seek issuance of a Change Order. ECF No. 43-2 at 4–5 (AMWA § 8.2). Among other enumerated reasons, if Cajun believed there was "any material increase in the quantity of any Materials required to perform the

---

[2] NTE means "not to exceed."

3

Work," it was required to notify Savage within ten days of becoming aware of the change, and if Savage agreed, it could issue a Change Order. *Id.* Article 8.4 of the Amended MWA stated in all capital letters that Cajun would not be entitled to payment for any change to the scope of work without first receiving a Change Order. *Id.* at 6. The same capitalized section also makes clear that a Change Order is required for any adjustment to the Base NTE Amount. *Id.* As was the case with the Cost Savings Amount, the parties agreed to submit disputes about Change Orders to the courts of Harris County, Texas. *Id.* at 7 (§ 8.7); MWA § 18.

The parties' agreements recognized that some of the engineering on the project was not complete when the Amended MWA was executed. Schedule A to the Amended MWA, ECF No. 43-2 at 10–19, addresses the scope of work that the project would include. The "Early Scope of Work" was to include "pre-construction, early mobilization, and early construction services," in connection with which Savage was "to provide the required IFC [issued for construction] engineering and design packages." *Id.* at 10 (AMWA Sch. A-2). The parties also agreed that the "Master Agreement Scope of Work will be amended to describe the all-inclusive Scope of Work following issuance of IFC engineering and design packages and the development of the Definitive Project Estimate." *Id.*

Despite both parties agreeing that the engineering and design packages were not complete, Cajun nevertheless represented that it had "the skills and experience necessary to review the engineering, cost estimating and other information used in the preparation of Schedule A" and "acknowledge[d] and agreed that the attached Schedule A is accurate, adequate and complete for [Cajun] to conduct the Work for aggregate consideration not to exceed the Total NTE Amount . . . ." ECF No. 43-2 at 2 (AMWA § 4.4(b).

Throughout the project, Cajun billed Savage for work under the original scope of work as well as on Change Orders for work outside the original scope of work. Munoz Dep., ECF No. 27-6 at 72–73. As the project progressed, because some of the IFC engineering design drawings were still not complete, the parties engaged in a "true-up" process by which they would reconcile their accounting disagreements. ECF No. 43-14; ECF No. 43-18; ECF No. 43-20; ECF No. 43-21; ECF No. 43-22. The purpose of the true-up process is disputed. While the parties agree that it was intended in part to identify the actual project costs in terms of time and materials, Cajun takes the position in this litigation that the true-up process was intended to adjust the Base NTE amount to account for the project's actual costs as compared to the estimate that was made prior to issuance of the IFC drawings. ECF No. 43 at 6–7. According to Cajun's understanding of the contract, the parties agreed that an amendment and/or Change Order would be issued to adjust the Base NTE amount in accordance with the true-up discussions. ECF No. 43 at 5 (citing Amended MWA at Schedule A-2).

As the project was nearing completion, on August 31, 2021, Cajun emailed Savage with a forecast of remaining costs for the project as well as an estimate of Cajun's share of the Cost Savings Amount. ECF No. 27-7 at 3–4. At that point, Cajun estimated its 40% share would be $762,819.72. *Id.* at 4.[3] Savage calculated Cajun's share to be slightly higher at $804,030.17. ECF No. 27 at 12. The project was completed on September 27, 2021. Thereafter, a disagreement about the Base NTE Amount arose. *E.g.* ECF No. 43-22. In an October 29, 2021 email exchange

---

[3] The court notes that the cited email from Cajun's Nathan Munoz lists "NTE EAC," which the court understands to mean "Not to Exceed Estimate at Completion," to be $35,492,950.69. It lists "Potential 40%" to be $762,819.72, which is exactly 40% of the difference between the NTE EAC and the $37.4 million Base NTE Amount. Thus, as of August 31, 2021, even Cajun thought the Base NTE Amount had not changed since the Amended MWA was executed.

between Savage's Terry O'Connor and Cajun's Dave Hill, Savage took the position that the Base NTE Amount remained at $37.2 million. *Id.* at 1. Cajun responded with "What you have presented has the true-up rolled up into the NTE which is outside the contract." *Id.* Cajun went on to explain its understanding that "any increase in the quantity of materials compared to the open book estimate would be a change order." *Id.* The parties continued to discuss the issue but did not reach agreement.

On March 21, 2022, Cajun sent Savage a letter with subject line "Change Order Request (COR) – 071." ECF No. 55-24 (hereafter COR-71). The letter is a follow-up to the parties' November and December 2021 meetings. *Id.* at 1. According to the letter "IFC Engineering and Design Documents were not fully issued at the time of establishing and agreeing upon the Base NTE Amount," and thus the Amended MWA provided that the scope of work would later be amended to describe the "all-inclusive Scope of Work following issuance of" the IFC drawings. *Id.* The letter states that, pursuant to Section 8.2(iv) of the Amended MWA, "Cajun is entitled to a Change Order" when there is a material increase in the quantity of materials to perform the Work. *Id.* at 2. The letter then includes a table showing various costs that had previously been submitted for payment under the original scope of work and paid by Savage, but which cost more than what had been estimated when the Amended MWA was executed. *Id.* at 4; *see also* ECF No. 86 at 22–23, 45, 54 (hearing transcript).

In a letter sent two days later, on March 23, 2022, with subject line "Final Project Invoicing" Cajun explains that its billings to that date of $35,547,924.02 under the purchase order associated with the Base NTE "incorrectly include[d] costs that should have been applied to the COR Purchase Order, as outlined in the Cajun COR-71 request of March 14, 2022." ECF No. 27-8 at 6. Cajun further explains that those "costs [were] associated

with the IFC Engineering and Design Amendment (aka "True-up" . . .) in the amount of $3,002,194.92 . . . for a total of $3,160,194.37 of misapplied costs against the Base NTE Amount Purchase order." *Id.* at 6. In other words, as the court understands Cajun's position at the time, COR-71 was intended to move costs it had previously invoiced and received payment in the original scope of work column into the Change Order column. That would have had the effect of lowering the total cost billed under the Base NTE Amount, thus increasing its share of the Cost Savings Amount. Accordingly, Cajun enclosed an invoice for $2,004,908.14. *Id.* at 8. On April 10, 2022, Savage paid the $804,030.17 that it believed it owed, but which Cajun characterized as a "partial payment" in a letter that demanded an additional $1,200,877.97, ECF No. 27-8, which is the amount now in dispute in this case.

Needless to say, Savage did not pay the additional amount Cajun invoiced, so on September 22, 2022, Cajun's counsel sent Savage a demand letter. ECF No. 27-9. The demand letter did not change the amount of compensation Cajun was seeking but did change the theory on which the demand was based. Cajun's counsel explained that the costs tabulated in COR-71 "were beyond Cajun's base scope of Work and should have been memorialized in a Change Order *increasing the Base NTE Amount*." *Id.* at 4 (emphasis added). Rather than saying that the costs tabulated in COR-71 were incorrectly billed under the original scope of work, Cajun pivoted to saying that the costs tabulated in COR-71 should have been included in a Change Order that would itself have increased the agreed upon Base NTE Amount.[4] Cajun does not

---

[4] Cajun continues to sponsor both theories. At a May 15, 2024 hearing, Cajun's counsel explained that "whether you're moving [costs] from bucket one to bucket two or whether you're moving the ceiling, the not-to-exceed number through a contract amendment, you get to the final end result both ways." ECF No. 86 at 57.

take the position that a Change Order was ever requested to explicitly alter the Base NTE Amount, or that Savage ever agreed to alter the Base NTE Amount[5]—the argument is that it *should have* happened. Nor does Cajun take the position that Savage agreed to shift costs from one column to another.

In the demand letter, Cajun also discusses its view of what constitutes a Change Order. According to Cajun, "A Change Order, as defined by the Contract, is a change to the description of Work, time for performance, or compensation." ECF No. 27-9 at 6. Cajun then argues that Savage "continuously changed the description of Cajun's Work by issuing additional IFC drawings on a rolling basis." *Id.* This lawsuit ensued.

Savage filed its Complaint in this court on October 3, 2022, seeking a declaratory judgment that it owes Cajun no further compensation under the contract, and asserting causes of action for breach of contract and attorney's fees. ECF No. 1 at 13–15. On November 11, 2022, Cajun filed counterclaims seeking damages for breach of contract, quantum meruit and unjust enrichment, promissory estoppel, and violations of the Texas Prompt Pay Act, as well as for attorney's fees and costs. ECF No. 5 at 18–20. On November 7, 2023, Savage filed its First Amended Complaint, ECF No. 29, and Cajun filed its First Amended Counterclaim, ECF No. 30. Cajun continues to assert claims for breach of contract, including one based upon violations of the Texas Engineering Practice Act, and one cause of action for Prompt Pay Act violations. ECF No. 35 at 23–24. Cajun has abandoned its equitable claims for quantum meruit, unjust enrichment, and promissory estoppel. Cajun continues to seek attorneys' fees, costs, and interest. *Id.* at 24.

---

[5] The court notes that Cajun's counsel agreed at the hearing that COR-71 is not itself properly characterized as a Change Order. ECF No. 86 at 55. Cajun's counsel explained that COR-71 is a "final reconciliation" and "not actually a change order," and served the purpose of moving costs from around "as an accounting protocol."

Savage now seeks partial summary judgment on its declaratory judgment action and on all of Cajun's counterclaims. ECF No. 27. Cajun seeks partial summary judgment on its breach of contract counterclaims, on Savage's breach of contract claim, and on Savage's request for declaratory judgment. ECF No. 55. Cajun has also moved for partial summary judgment on Savage's claim for attorneys' fees. ECF No. 56.

### 2. Summary Judgment Standard of Review

"Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmovant, 'the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." *Davenport v. Edward D. Jones & Co.*, 891 F.3d 162, 167 (5th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). No genuine issue of material fact exists if a rational jury could not find for the nonmoving party based on the complete record. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 455 (5th Cir. 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). If this burden is met, the nonmovant must then "go beyond the pleadings," using competent summary judgment evidence to cite "specific facts" showing a genuine issue for trial. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)).

The court reviews all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Lincoln Gen. Ins. Co.*, 401 F.3d at 350. The court, however, does not have a duty "to

search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) ("Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports [the] claim."). "[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'" are not enough to defeat a properly supported motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). The nonmovant must "articulate the precise manner in which the submitted or identified evidence supports [the] claim." *CQ, Inc. v. TXU Mining Co.*, 565 F.3d 268, 273 (5th Cir. 2009) (quoting *Smith ex rel. Estate of Smith v. United States*, 391 F.3d 621, 625 (5th Cir. 2004)).

### 3. *Discussion*

#### A. *Savage's Request for Declaratory Judgment*

Savage seeks summary judgment on its request for declaratory judgment that it owes Cajun no further compensation under the contract. ECF No. 27. According to Savage, it is undisputed that it has paid Cajun for all its time and materials. *Id.* at 2. As for Cajun's share of the Cost Savings Amount, Savage argues that the Base NTE Amount was "static throughout the life of the project," and that it paid Cajun 40% of the difference between the cost to complete the original scope of work and the Base NTE Amount. *Id.* at 3. Cajun argues that Savage agreed to issue an "amendment and/or change order" after completion of the project based on the "true-up" process that would either allow costs to be shifted out of the original scope of work or to allow the Base NTE Amount to increase, either of which would increase the Cost

Savings Amount. ECF No. 43 at 12–13.[6]  Cajun also argues that Savage's declaratory judgment claim should be denied because it will be resolved by virtue of a ruling on either party's breach of contract action. ECF No. 55 at 15

The court first addresses Cajun's procedural argument. The court agrees with Cajun that a declaratory judgment action should be dismissed when it is just the "mirror image" of an existing breach of contract action. *Cf.* ECF No. 55 at 16 (citing cases). But resolution of either party's breach of contract actions is not necessarily fully dispositive of Savage's Declaratory Judgment Action. For example, the court could find that Cajun did not breach the contract by failing to comply with contractual conditions precedent to Savage's performance, as it does below, yet agree with Cajun on its contract interpretation that the true-up process altered the Base NTE Amount, which it does not. The court could also find that Savage did not breach the contract by failing timely to provide the IFC drawings, as it does below, yet agree with Cajun that COR-71 has the contractual effect of changing the Cost Savings Amount, which it does not. These are all independent issues. Moreover, the parties agreed in Section H-4 that "any disputes between the Parties with respect to the Cost Savings Amount shall be resolved in accordance with Article 18," in which the parties consented to the venue of this court and submitted to the court's jurisdiction. ECF No. 43-1 at 43 (MWA § 18); ECF No. 43-2 at 23 (Sch. H-4). Savage's request for declaratory judgment is properly before the court.

The court turns to the merits. This is essentially a question of contract interpretation. "When interpreting a written contract, '[t]he court's primary concern is to enforce the parties' intent as

---

[6] Cajun does not clarify which theory it is actually relying on and appears to argue that there is no difference between them.

contractually expressed, and an unambiguous contract will be enforced as written.'" *Ryder v. Shell Oil Co.*, 131 F. Supp. 3d 635, 643 (S.D. Tex. 2015) (quoting *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005)).

The Base NTE Amount was set by contract at $37.4 million. ECF No. 43-2 at 1 (AMWA ¶ 1, stating that "Base NTE Amount" is defined in Schedule H-1); ECF No. 43-2 at 21 (Sch. H-1). The Cost Savings Amount was defined as the difference between the sum for which the work was completed and the Base NTE Amount. ECF No. 43-2 at 23 (Sch. H-4). The Base NTE Amount could be amended, but only by a Change Order. ECF No. 43-2 at 6 (AMWA § 8.4). Change orders had to be agreed to by Savage before they could become effective. ECF No. 43-2 at 4 (AMWA § 8.1, stating that Savage could issue a change order if it desired to change Cajun's compensation); ECF No. 43-2 at 5 (amended Article 8.2, stating that "to the extent [Savage] agrees [with Cajun about the need for a Change Order], Savage shall issue a Change Order pursuant to Section 8.9"). Finally, the parties agreed that there would be no change to the compensation to be paid by virtue of implication, course of conduct, or constructive change order. ECF No. 43-2 at 4 (amended Article 8.1).

There is no dispute that Savage did not agree to the change in compensation that Cajun was attempting to effectuate by its submission of COR-71. Thus, COR-71 could not have altered the Base NTE Amount. There is nothing in the contract to suggest that the Base NTE Amount would automatically increase or decrease based on invoices submitted or discussions between the parties. There is also no basis in the contract or in the facts for Cajun's position that it could unilaterally shift millions of dollars of costs that it had billed under the original scope of work into the category of work requiring a Change Order. Again, any Change Order would have required Savage's approval, so even if Cajun had earlier

submitted a Change Order for each line item listed in COR-71, it is entirely speculative whether the cost would have shifted as Cajun sought to do.

Cajun argues that the provisions of the Amended MWA stating that the parties would later amend the Scope of Work to describe the all-inclusive Scope of Work, ECF No. 43-2 at 10 (Sch. A-2), operate as an amendment to the Base NTE Amount. The court disagrees. At best, the parties agreed to a later negotiation but never had a meeting of the minds on the result of that negotiation. *See Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231 at 237–38 (Tex. 2016) (explaining that an "agreement to agree" is enforceable only if it specifies all its material and essential terms and leaves none to be agreed upon as the result of future negotiations, but such an agreement may be enforced if it contains all material terms of the future contract). There is no evidence that the parties agreed upon an increase in the Base NTE or on exactly how that increase would be calculated. The agreement to negotiate in the future was not an enforceable agreement to re-calculate the Base NTE Amount.

Cajun relies on David Hill's affidavit to argue that "Savage participated in the true-up of the Base NTE scope of work throughout the project." ECF No 43 at 12. Hill states that the Cost Savings Amount would be determined by comparing the time and material invoicing under the Base NTE scope of work to the "final Definitive Project Estimate" and notes that the true-up "was necessary for the cost underrun calculation." ECF No. 43-3 at 3, ¶ 10. But that is not what the Amended MWA says. Schedule H-1 defines the Base NTE Amount to be $37.4 million absent an amendment by virtue of a Change Order. ECF No. 43-2 at 21 (Sch. H-1). It does not define the Base NTE Amount to be a variable figure dependent upon a "final Definitive Project Estimate." That language does not exist.

Hill goes on to discuss Cajun's motivations and expectations when it entered into the Amended MWA. ECF No. 43-3 ¶ 11. He explains that Cajun was willing to accept the Base NTE Amount given Savage's agreement to later revise the Base NTE price "if the drawings indicated more work than originally estimated." *Id.* He claims that Cajun *would have* submitted an "amendment and/or change order for reconciliation" earlier had Savage provided the IFC drawings earlier. *Id.* Hill explains that Savage was slow throughout the project in releasing its final designs, and that Savage never issued some of the designs at all. *Id.* at 4, ¶ 16. Hill describes meetings and email exchanges wherein Cajun submitted to Savage its true-up calculations and Savage acknowledged them, as well as the potential that the scope of work was changing. *Id.* at 5, ¶¶17–18. Hill also explains that there were disagreements and concerns about the delayed IFC drawings, as well as about Savage's requirement that Cajun bill under two separate invoices. *Id.* ¶ 18. Hill claims that Savage "had regular notice of and authorized all changes and conditions that required adjustments to the project scope, whether the parties called them 'true-ups' or 'change orders' and regardless of whether they invoiced under the purchase order for base scope work or change order work." *Id.* at 6, ¶ 21. It bears repeating that all the work described in COR-71 was done and paid for *without* a Change Order, ECF No. 86 at 22–23, 45, 54–55 (hearing transcript), which was required to change the Base NTE Amount. Hill seems to be saying that the Base NTE Amount was constantly changing as the parties discussed the actual costs being incurred. But the contract clearly states that the Base NTE Amount would not change by implication, ECF No. 43-2 at 4 (AMWA § 8.1), and there is no evidence that the parties agreed to amend that contract language.

Hill also discusses the parties' interactions after the project was complete. He notes that the parties met in November and

December of 2021 to discuss "reconciling the Base NTE estimate
with a change order," but that no agreement was reached. ECF No.
43-3 at 7, ¶ 27. He goes on to say that "Cajun had been requesting
an amendment and/or change order for the reconciliation since the
beginning of the project," but that "Savage directed Cajun to wait
until the end of the project to submit the final reconciliation, and
then rejected Cajun's accounting." *Id.* ¶ 28.

At best, Hill's affidavit reflects Cajun's and Savage's
disagreements about how to administer the contract they entered.
There is no evidence that the parties agreed to increase the Base
NTE Amount. Hill seems to be saying that a Change Order was
not required in order to alter the Base NTE Amount. There is no
evidence to suggest that the parties agreed to amend the contract's
language, which is to the contrary. There is no evidence that
Savage agreed to move costs from one column to another as Cajun
sought to do when it submitted COR-71. There was never an
agreement to increase the Base NTE Amount, even if it was the
parties intentions to reach one. There is also no evidence that the
discussions had during the true-up meetings had the effect of
altering the terms of the parties written contract.[7]

Importantly, Cajun is not claiming that Savage breached the
contract by failing to engage in negotiations about a change to the
Base NTE Amount. Moreover, Cajun dropped its equitable claims,
so the court is left with evaluating the actual agreements the
parties reached, not those that the parties hoped to reach in the
future. Requests for meetings, discussions, and negotiations are
not agreements. One side's motivations for entering into a contract
are not agreements that can be enforced.

---

[7] Thus, even if the court accepts Hill's declaration, it does not change the outcome of the case, so Savage's objections to Hill's declaration, ECF No. 53, are **DENIED as MOOT**.

Savage owes Cajun no further compensation for its portion of the Cost Savings Amount.

### B.    Cajun's Counterclaims

In its First Amended Counterclaim, Cajun alleges that Savage breached the contract when it failed to provide final designs, failed to acknowledge increases in materials, and failed to pay Cajun its share of the Cost Savings Amount. ECF No. 35 at 23. Cajun also alleges that Savage breached the contract based on violations of the Texas Engineering Practices Act (TEPA) when it failed to provide final designs, failed to meet the applicable standard of care as the engineer of record on the project, and failed to acknowledge increases in materials. *Id.*[8] Cajun alleges that Savage violated the Texas Prompt Pay Act when it failed to pay Cajun all the amounts it owed. *Id.* at 24. Cajun also seeks attorney's fees and costs. *Id.*

To succeed on a breach of contract claim, a party must prove: "'(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)). The party seeking recovery "must show that their alleged damages are the natural, probable, and foreseeable consequence of the alleged breach." *Meyers v. TrustTexas Bank, S.S.B.*, No. 03-18-00193-CV, 2018 Tex. App. LEXIS 9493, at *7 (Tex. App.—Austin Nov. 21, 2018, no pet.) (citing *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)). Summary judgment

---

[8] Cajun does not appear to argue that it can hold Savage liable for violations of the TEPA as a free-standing cause of action. The court does not see that TEPA allows a private cause of action for damages. Rather, Cajun is using Savage's alleged failures under TEPA's engineering standards to show that Savage breached the contract. The court's resolution of the main breach of contract claims resolves the TEPA issues as well.

is appropriate if the party seeking recovery does not present evidence that the alleged breach is related to the alleged damages. *See Meyers*, 2018 Tex. App. LEXIS 9493 at *8–13.

Savage did not breach the parties' contract by failing to pay the additional $1,200,877.97 that Cajun has demanded. As the court explained above, Savage owes Cajun no further compensation under the contract and therefore there is no breach by failing to pay what is not owed. Similarly, Savage did not fail to acknowledge increases in materials. The parties agree that Savage has paid Cajun for all its time and materials, including increases over any estimates that had been made before the Amended MWA was executed. What Cajun is really saying is that Savage refused to recharacterize certain costs. But the court has already concluded that Savage had no contractual duty to do so.

The court turns to Cajun's claim that Savage breached the contract by failing to provide final designs. ECF No. 35 at 23. Cajun's argument is that Savage's failure to provide final drawings and designs required the implementation of the true-up process and prevented the parties from finalizing the scope of work. ECF No. 55 at 1. The court understands Cajun's position to be that it would have been able to renegotiate the Base NTE Amount had it received the drawings earlier, which would have increased their share of the Cost Savings Amount.

The court first observes that the parties entered into the Amended MWA with full knowledge that IFC drawings were not complete.   ECF No. 43-2 at 10 (AMWA Sch. A-2). More importantly, assuming that the IFC drawings were late, there is no evidence that lack of the drawings and designs prevented Cajun from performing its work on the project. The parties agree that the project was ultimately completed. There is also no evidence that lack of the drawings prevented Cajun from being paid in full for all its time and materials. The parties agree that Cajun received all

17

the compensation it was due for its time and materials, including any increases that were occasioned by alterations to the scope of work by later-issued IFC drawings. The only question is whether Savage's failure to provide the drawings on time or earlier would have altered the Base NTE Amount and thus Cajun's share of the Cost Savings Amount. It did not.

Savage's failure, assuming there was one, to provide the IFC drawings did not cause Cajun any damages. As discussed above, the Base NTE Amount could be altered only by a Change Order. The parties never agreed to a Change Order to alter the Base NTE Amount. The contract does not provide for an automatic change in the Base NTE Amount whenever there is a change in the scope of work. Rather, the Amended MWA allowed for the parties to use Change Orders for Cajun to be paid for work outside the original scope of work. The court also notes that Cajun originally billed for all the work listed in COR-71 on invoices under the original scope of work, not by requesting a Change Order for work outside the original scope. Cajun then sought to shift all the work listed in COR-71 into the Change Order column. Then, in its demand letter, Cajun attempted to use COR-71 as a basis to increase the Base NTE Amount. Savage agreed to none of that. The Base NTE Amount was not altered. Savage did not agree to retroactively shift the COR-71 work onto a different part of the balance sheet. The late-issued drawings simply did not have any bearing on the Cost Savings Amount. Cajun's breach of contract claims should be dismissed.

Because Cajun's Prompt Pay Act violation requires a showing that Savage failed to pay an amount that was due, Tex. Prop. Code § 28.002, and because Savage did not fail to pay Cajun, the Prompt Pay Act cause of action should also be dismissed.

### C.    Savage's Breach of Contract Cause of Action

In its First Amended Complaint, Savage alleges Cajun breached the contract by:

- Failing to submit a final invoice within fifteen days of final completion as was required by Section 7.3 of the MWA;

- Failing to comply with the other requirements of Section 7.3 of the MWA, which is a condition precedent to payment;

- accepting final payment and thus waiving any additional claims for payment under Section 7.3 of the MWA;

- failing to obtain prior approval for the cost increases contemplated by COR-71 and thus waiving any right to submit that change order later;

- submitting COR-71 months after final completion and the contractual deadline;

- improperly seeking to increase the Base NTE amount;

- failing to report material cost increases as required by Section 8.2 of the MWA.

ECF No. 29 at 14–15.

At the hearing on May 15, 2024, the court ordered Savage to file briefing on whether the foregoing could constitute breaches of contract. Savage submitted briefing raising entirely new issues. Savage now argues that "Cajun's conduct post-completion constitutes a breach of the MWA by its express terms" and discusses § 20.9(d), (f)(i)(C), and (f)(ii) of the MWA. ECF No. 89 at 2–4. These provisions pertain to "Accuracy of Records," and "Notice of Non-Compliance." These sections were never mentioned in any of the briefing before the hearing and are not alleged in the live pleadings. The court will not consider new arguments and theories at this late stage of the case.

19

"A breach occurs when a party fails or refuses to perform an act that it has expressly promised to perform." *Note Inv. Grp., Inc. v. Assocs. First Capital Corp.*, 83 F. Supp. 3d 707, 728 (E.D. Tex. 2015) (citing *Franconia Assocs. v. United States*, 536 U.S. 129, 142–43 (2002); *AMS Constr. Co. v. K.H.K. Scaffolding Houston, Inc.*, 357 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd); *Hoss v. Alardin*, 338 S.W.3d 635, 650 (Tex. App.—Dallas 2011, no pet.)). Furthermore, the party seeking recovery "must show that their alleged damages are the natural, probable, and foreseeable consequence of the alleged breach." *Meyers v. TrustTexas Bank, S.S.B.*, No. 03-18-00193-CV, 2018 Tex. App. LEXIS 9493, at *7 (Tex. App.—Austin Nov. 21, 2018, no pet.) (citing *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981)).

There is a difference between a covenant to perform and a condition precedent. A covenant is an "agreement the breach of which gives rise to a cause of action for damages," while breach of a condition precedent merely "affects the enforceability of the provision to which the condition is attached." *City of Alamo v. Garcia*, 878 S.W.2d 664, 665 (Tex. App.—Corpus Christi 1994, no writ).

Most of Savage's breach of contract claims are based on Cajun's failure to meet a condition precedent, not on its failure to perform a covenant. Article 7.3 of the MWA, which was not amended by the Amended MWA, governs the timing of the final invoice, and plainly states that its terms are "a condition precedent to Savage's payment." ECF No. 43-1 at 26 (MWA Art. 7.3) Thus, Cajun's failure to submit a final invoice would merely stand as a barrier to it being paid. It is not an independent cause of action on which Savage can recover damages.

Similarly, Cajun's failures to report and obtain prior approval for any cost increases contemplated by COR-71 were

20

nothing more than failures to meet a condition precedent. AMWA § 8.2 set forth the requirements for issuance of a Change Order and AMWA § 8.4 mandated that a Change Order be approved before Cajun could undertake any change in the work, and that absent a Change Order, Cajun would be responsible for the costs associated with any such work. ECF No. 43-2 at 5–6. Cajun's alleged failures to report cost increases or seek prior approval for the work described in COR-71 would not give rise to a cause of action for damages. If anything, it would merely give Savage the right to withhold payment. The same is true of Cajun's late submission of COR-71.

In the same vein, Cajun's acceptance of final payment would have the effect of a waiver, not an affirmative claim for relief on Savage's part.

As for Savages claim that "Cajun improperly sought to increase the Base NTE amount even though Cajun knew – and freely admits – that the MWA prohibited Cajun from doing so," Savage has presented no evidence or argument that this would be a breach of the contract. As discussed above, the contract *does* provide for an increase to the Base NTE Amount. *Cf.* ECF No. 43-2 at 21 (AMWA Sch. H-1, stating that the Base NTE Amount could be altered by a Change Order). It makes no sense to say that Cajun's unsuccessful attempt to do what the contract allows could be a breach of contract.

The court also notes that there is a distinction between affirmative defenses and affirmative claims for relief. "An affirmative defense does not advance the claims of the party asserting it; it instead defeats the opponent's claim" while "[a] 'claim,' in contrast, includes the assertion of any existing '*right to payment* or to an equitable remedy.'" *Izen v. Laine*, 614 S.W.3d 775, 790–91 (Tex. App.—Houston [14th Dist.] 2020) (emphasis in original) (citing *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556,

564 (Tex. 2014); *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex. 1991); *Fawcett v. Grosu*, 498 S.W.3d 650, 663 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); Black's Law Dictionary 281-82 (9th ed. 2009)). Although Savage has not pleaded its claims as affirmative defenses, they are not actually affirmative claims for damages, but instead raise contractual provisions that would prevent Cajun's recovery.

For all the foregoing reasons, Savage's claims for breach of contract should be dismissed.

### D.    Attorneys' Fees

Cajun relies on Texas Property Code § 28.005(b) to argue that it is owed attorney's fees under its Texas Prompt Pay Act claim. Because Cajun has not proven a violation of the Texas Prompt Pay Act, it cannot recover fees. Both parties rely on Section 38.001 of Texas Civil Practice and Remedies Code to assert claims for attorneys' fees based on their claims for breach of contract. Because neither party has shown a breach of contract, neither party can recover attorney's fees. The same is true for Savage's claim for attorney's fees under Texas Civil Practice and Remedies Code § 38.0015, which allows attorney's fees as compensatory damages in the context of a construction contract, but only if recovery for attorney's fees under section 38.001 is permitted.

### 4.    Conclusion

The court recommends that Savage's motion for partial summary judgment, ECF No. 27, be **GRANTED**, that Cajun's motion for partial summary judgment, ECF No. 55, be **GRANTED in part and DENIED in part**, and that Savage's motion for partial summary judgment on Cajun's request for attorney's fees, ECF No. 56, be **GRANTED.** The court thus recommends that Savage's request for a declaration that it owes no further compensation to Cajun be **GRANTED**, and that both parties'

claims for breach of contract be **DISMISSED with PREJUDICE**. All claims for attorney's fees should be **DISMISSED with PREJUDICE**.

Because the court has not relied herein on any of the objected-to evidence, the objections and motions to strike the summary judgment evidence are **DENIED as MOOT**.

The parties have fourteen days from service of this Memorandum and Recommendation to file written objections. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. Failure to timely file objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See Thomas v. Arn*, 474 U.S. 140, 147–49 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276–77 (5th Cir. 1988).

Signed at Houston, Texas on August 30, 2024.

_____
Peter Bray
United States Magistrate Judge